On Application for Rehearing
The opinion of September 15, 2000, is withdrawn, and the following is substituted therefor.
Loretta M. Davenport Hood and James D. Davenport were divorced by an order of the trial court in 1982. The mother was awarded custody of the parties' two children. The father was ordered to pay alimony, child support, and postminority support. In the time since the divorce, the mother has obtained two judgments awarding her amounts for arrearages of past-due alimony and child support.
On April 29, 1999, the mother filed a petition to modify the father's child-support obligation; she later amended that petition, seeking to enforce the most recent judgment for arrearages. On January 27, 2000, the trial court conducted an ore tenus hearing. At the close of the evidence in that hearing, the trial court found the father in contempt of court for his failure to pay child support, and it ordered the father incarcerated for 30 days.
On February 3, 2000, the trial court entered a judgment that, among other things, found the father in criminal contempt of court for "willful contumacy" in failing to provide postminority support and medical insurance for the parties' daughter. On that same day, February 3, 2000, the trial court amended its judgment to *Page 270 
find the father in both civil and criminal contempt and ordered him incarcerated.
In its February 3, 2000, judgment, the trial court also established the father's total arrearage at $301,173.53. The trial court ordered the father to pay $3,200 per month toward the arrearage.[1] In addition, the trial court ordered that the father pay the mother $2,200 as an attorney fee.
On February 3, the father filed a motion for relief from the contempt citation; the trial court denied that motion. Also on February 3, the father appealed to this court and also filed in this court an emergency motion to stay, pending the resolution of his appeal, the operation of those portions of the trial court's judgment ordering him incarcerated. This court granted that motion pending further orders of this court and ordered that the father be released from jail.
Initially, we note that a trial-court judgment based on ore tenus evidence is presumed to be correct and that this court will not reverse absent a showing that the trial court abused its discretion. Watts v.Watts, 706 So.2d 749 (Ala.Civ.App. 1997).
In the parties' 1982 divorce judgment, the father was ordered to pay, in addition to certain medical expenses, $1,500 per month as child support. At some point after the parties divorced, the father was convicted on a charge of felony theft and served time in prison. He testified at the January 27, 2000, hearing that his conviction often made others unwilling to employ him.
On April 15, 1997, Judge J. Scott Vowell entered a judgment finding the father in contempt of court for his failure to pay alimony and child support and assessing arrearages against the father. Judge Vowell set a date in October 1997 to conduct a hearing to determine whether the father had, in good faith, complied with the terms of the April 15, 1997, judgment.
On October 14, 1997, Judge Vowell again determined that the father was in contempt of court and reduced the father's further arrearage to a judgment in favor of the mother. Judge Vowell ordered the father to pay $400 monthly toward the arrearage, but noted that because he refused to modify the continuing obligations under the previous judgments, those amounts would continue to accrue.
On September 18, 1998, Judge Vowell entered another judgment on the mother's petition for a rule nisi. Judge Vowell found that the father had recently begun earning $3,000 per month as a consultant and that, although the payments were not *Page 271 
made regularly, the father had made payments constituting the full amount due under the October 1998 judgment. Judge Vowell declined to find the father in contempt because, "for the first time in years, [the mother] is receiving financial help for [the parties'] children." Judge Vowell determined the then current arrearage to be $259,431.84, and he entered a judgment in favor of the mother in that amount. Judge Vowell's order also stated:
 "3. Davenport is ordered to continue making payments on the arrearage in the minimum amount of $400 per month through December 21, 1998. On January 1, 1999, those monthly payments will increase to Six Hundred Dollars ($600). For so long as he complies with the terms of this order, such payment will be considered as evidence of his good faith effort to comply with his obligations to the plaintiff, unless otherwise ordered by this Court. His current obligations under the Final Judgment as modified are not affected by this order and will continue to accumulate."
We note that a different trial judge, Judge R.A. Ferguson (hereinafter the "trial court"), conducted the January 27, 2000, hearing and entered the February 3, 2000, orders.
The father is currently employed as a consultant. He testified that his employers do not pay him directly, but rather that they pay his salary into his wife's corporation, Wound Care Associates d/b/a Davenport Realty. The father's wife then pays him a salary from the corporation.
In September 1997, Joe Gilchrist hired the father as a consultant and paid the corporation $3,000 per month as the father's salary. In early 1998, the father's employment with Gilchrist ended. However, the father returned to work for Gilchrist from July 1998 through August 1999, earning $3,000 per month.
The father testified that in March 1998, Mark Osborn hired him as a consultant; the father testified that Osborn pays the corporation, as his salary, $2,600 every two weeks.[2] The father also testified that Osborn paid $60,000 annually for his consulting services.
Although the corporation received $48,000 for the father's consulting services in 1998, the corporation paid the father a gross salary of only $24,000 for 1998. The corporation received, as payments for the father's salary, approximately $84,000 in 1999.[3] However, the corporation paid the father a gross salary of $48,000 for 1999. The father testified that his wife determined the amount of his annual salary he received from the corporation.
The September 1998 judgment ordered the father to pay $600 per month toward the accumulated arrearage in excess of $250,000. The father's obligations to pay child support and postminority support continued to accrue under that judgment because those obligations were in excess of the $600 per month the trial court ordered the father to pay. It is undisputed that the interest payments on the accumulated arrearage greatly exceeded $600.
The father testified that he has no assets. The $400,000 house in which he resides is held solely in his wife's name. The 1998 Dodge Durango vehicle the father drives is also in his wife's name. The father testified that most of the time, he *Page 272 
deposits his salary into his wife's bank account and she then writes a check to him for any expenses he has. The father and his wife do not have a joint checking account.
The mother testified that she and her husband had borrowed money to send the parties' children to college. She testified that the payments on the loans total $700 per month.
The father first argues that the trial court erred in holding him in criminal contempt of court. "Criminal contempt" is defined as either
 "(i) Misconduct of any person that obstructs the administration of justice and that is committed either in the court's presence or so near thereto as to interrupt, disturb, or hinder its proceedings, or
 "(ii) Willful disobedience or resistance of any person to a court's lawful writ, subpoena, process, order, rule, or command, where the dominant purpose of the finding of contempt is to punish the contemnor."
Rule 70A(a)(2)(C), Ala.R.Civ.P.
Civil contempt is a person's willful failure to comply with "a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with." Rule 70A(a)(2)(D), Ala.R.Civ.P.
The trial court found the father to be in both civil and criminal contempt. The trial court sentenced the father to five days in jail for his failure to provide postminority support. The trial court also sentenced the father to an additional 25 days in jail, which represented five days in jail for each of the five months he had failed to provide medical insurance for the parties' daughter.
 "Our supreme court discussed civil and criminal contempt in [State v. Thomas], 550 So.2d 1067, 1072
(Ala. 1989), and stated:
 "`Contempts are characterized as either civil or criminal. Civil contempt seeks to compel or coerce compliance with orders of the court, while a criminal contempt is one in which the purpose of the proceeding is to impose punishment for disobedience of orders of the court.'
 "`The sanction for civil contempt continues indefinitely until the contemnor performs as ordered. A critical distinction is that the sanction for criminal contempt is limited in Alabama district and circuit courts to a maximum fine of $100 and imprisonment not to exceed five days.'
"(Citations omitted.)
 "Our supreme court also stated in [State v. Thomas], 550 So.2d 1067, 1073:
 "`The line between civil and criminal contempt can sometimes become blurred. . . .'
 "`Confusion arises in attempts to classify civil and criminal contempts, because the elements often overlap. In appropriate circumstances, however, a party's actions can support a finding of both civil and criminal contempt.'
"(Citations omitted.)
". . . .
 "The question of whether this is civil contempt or criminal contempt becomes important in this case because a contemnor must be in a position to purge himself from the contempt. Mims v. Mims, 472 So.2d 1063
(Ala.Civ.App. 1985). In order to purge himself in a criminal contempt case, the contemnor must pay the fine imposed, serve the authorized time, or do both. Kalupa v. Kalupa, 527 So.2d 1313 (Ala.Civ.App. 1988). In order to purge himself in a civil contempt *Page 273 
 case, the contemnor must comply with the court's order. Rule 33.4(b), A.R. Crim. P."
Hill v. Hill, 637 So.2d 1368, 1370 (Ala.Civ.App. 1994).
Civil contempt carries no definite term of imprisonment; the party jailed on a contempt charge "`carries the [key] of his prison in his own pocket' [and] can end the sentence and discharge himself at any moment by doing what he had previously refused to do.'" Johnson v. State,675 So.2d 512, 513 (Ala.Crim.App. 1995) (quoting Lightsey v. KensingtonMortgage Finance Corp., 294 Ala. 281, 285, 315 So.2d 431, 435 (1975) (in turn quoting earlier cases, including In re Nevitt, 117 F. 448, 461 (8th. Cir. 1902)).
The trial court ordered the father imprisoned for a definite time, during which he could not be released by complying with the court's orders.
The father argues that he was not in criminal contempt because, he says, he complied with the provisions of the September 1998 judgment. The provisions of that judgment provided only that the father pay $600 per month toward the arrearage in order to be considered in "good-faith" compliance with the terms of that judgment. That judgment specifies that the father's continuing child-support obligations would continue to accumulate during the time the father was paying only $600 per month toward the accumulated arrearage. The father did make those monthly $600 payments.
The trial court's judgment ordering that the father be incarcerated was clearly a punishment for criminal contempt. It cannot be construed as a sentence of incarceration on a finding of civil contempt. The trial court ordered the father incarcerated for the statutory maximum of five days for each of its six separate contempt findings. The judgment did not provide for a mechanism for the father's release should he come into compliance with the trial court's orders. Given the express language of the September 1998 judgment, we cannot agree that the father was incriminal contempt for willfully failing to comply with the terms of the September 1998 judgment.
The father has not challenged on appeal the trial court's determination that he was once again in civil contempt of court. However, the father argues that because the parties' children are now emancipated, the mother's attempts to collect on the arrearage judgment should be limited to those remedies, such as garnishment or attachment, that are available for the collection of ordinary money judgments. Thus, the father argues against the use of the court's contempt powers to enforce a judgment for a child-support arrearage where the petition to enforce that judgment is filed after the child is emancipated.
In support of his argument, the father cites Sutton v. Sutton,359 So.2d 392 (Ala.Civ.App. 1978), in which a father challenged the trial court's jurisdiction to entertain a contempt action seeking to enforce a child-support arrearage judgment. In Sutton, this court declined to say that the trial court did not have jurisdiction to entertain a contempt action under those facts. The court noted that the father had submitted to the jurisdiction of the court by petitioning for a modification.
The father in Sutton cited cases from other jurisdictions that have held that, once a child is emancipated, a custodial parent may not enforce a judgment based on a child-support arrearage through a contempt action. In this appeal, the father cites one of those cases, Dawson v.Dawson, 71 Wn.2d 66, 426 P.2d 614 (1967). *Page 274 
In Dawson, the Supreme Court of Washington stated that a trial court's "jurisdiction to enforce a support-money judgment is predicated upon the continued dependency of minor children." 71 Wn.2d at 67, 426 P.2d at 615
(citations omitted). The court concluded that "[w]hen the children reach the age of majority, the purpose and justification for the extraordinary remedy of contempt cease." Id., 71 Wn.2d at 68, 426 P.2d at 616.
Other cases holding that a judgment for past-due child support may not be enforced through a contempt action include: Fox v. Fox,56 Ill. App.3d 446, 371 N.E.2d 1254 (1978); Jenkins v. Jenkins,687 N.E.2d 256 (Ind.App. 1997); Lieder v. Straub, 230 Minn. 460,42 N.W.2d 11 (1950); Reynolds v. Reynolds, 192 Okla. 564, 137 P.2d 914
(1943); Kuykendall v. Wheeler, 890 S.W.2d 785 (Tenn. 1994); and InInterest of Dickinson, 829 S.W.2d 919 (Tex.App. 1992). The rationale of these cases is that child-support judgments may be enforced in the same manner as money judgments, and, therefore, because contempt is an extreme sanction, after the child reaches the age of majority, it should be resorted to only where there is no other manner of enforcing the judgment.
However, as the mother points out in her brief on appeal, many jurisdictions have taken the view that the collection of a child-support judgment through the use of contempt proceedings, after the child reaches the age of majority, is appropriate. See Tande v. Bongiovanni,142 Ariz. 120, 688 P.2d 1012 (1984); Gibson v. Bennett, 561 So.2d 565
(Fla. 1990) (decided under URESA); Jackson v. State, 167 Ga. App. 509,306 S.E.2d 757 (1983) (decided under URESA); Crumpacker v. Crumpacker,239 Kan. 183, 718 P.2d 295 (1986); Wasson v. Wasson, 52 Mich. App. 91,216 N.W.2d 594 (1974); White v. White, 289 N.C. 592, 223 S.E.2d 377
(1976); Cramer v. Petrie, 70 Ohio St.3d 131, 637 N.E.2d 882 (1994); andGriffin v. Reeve, 141 Wis.2d 699, 416 N.W.2d 612 (1987).
The prevalent theory behind the cases holding that a contempt action may be used to enforce a child-support judgment after the children reach the age of majority is that a trial court that issues a child-support order is entitled to enforce that judgment through equitable means. Those jurisdictions perceive child-support judgments to differ in nature from an ordinary money judgment because, as is well settled under the caselaw of this state, a parent has a duty to support his or her minor child.See State ex rel. Shellhouse v. Bentley, 666 So.2d 517 (Ala.Civ.App. 1995); Anderson v. Loper, 689 So.2d 118 (Ala.Civ.App. 1996). Therefore, those cases conclude, such judgments should be enforced by more effective means. The Florida Supreme Court has written:
 "Support payments are imposed upon a parent because the trial court has determined the payments are necessary to provide for the needs of the child. When a support-obligated parent fails to make support payments, the responsibility for maintaining the child falls entirely upon the custodial parent. In many instances, the custodial parent cannot shoulder the additional financial burden that rightfully and lawfully belongs to the nonpaying parent. As a consequence, the family often suffers hardships that otherwise could be avoided, and in some cases they are forced to seek aid from the state. In any event, due to the delinquency of a nonpaying parent, money from a support-dependent parent's own funds or from the state has been expended to maintain the child during minority.
". . . . *Page 275 
 "Upon emancipation of a minor child, the support-dependent parent is not magically reimbursed for personal funds spent nor debts incurred due to nonpayment of child support. Hardships suffered by a family do not disappear. A family's feelings of indignation from abandonment by the nonpaying parent or from past reliance on public assistance are not forgotten. Society's interest in ensuring that a parent meets parental obligations must not be overlooked simply because the child has attained the age of majority. The support obligation does not cease; rather it remains unfulfilled. The nonpaying parent still owes the money.
 "Today, support-dependent parents and the courts often experience great difficulty obtaining compliance with support orders while a child is a minor even though the remedy of contempt is available. If the courts lack the power to enforce child support orders through contempt proceedings after the child reaches majority, a nonpaying parent may escape his or her support obligation entirely, especially a parent with little or no property subject to attachment in an action at law. If a parent dependent on support is left with the less effective civil action, the nonpaying parent may be encouraged to hide assets or purposefully elude the court until the child attains [the age of majority], preferring the civil action on a debt rather than a contempt proceeding. . . ."
Gibson v. Bennett, 561 So.2d at 571-72 (emphasis added).
In Alabama, a willful failure to pay child support is a civil contempt of court subject to "all sanctions for enforcement of judgments." §26-17-15, Ala. Code 1975. Section 26-17-15 does not limit a finding of civil contempt for the enforcement of a child-support obligation to only those actions initiated before a child reaches the age of majority or becomes emancipated. Nothing in Alabama law indicates that the enforcement of a judgment on a child-support arrearage may not be made through the contempt powers of the courts even after the child has reached the age of majority. To hold otherwise would mean that a custodial parent who has shouldered the burden of supporting the children with little or no financial assistance from the noncustodial parent would be left with only the ability to subject the noncustodial parent's property or wages to an execution of the arrearage judgment. "An obligor who has little or no property subject to attachment and who is crafty or simply fortunate enough to elude the law's grasp until his children are [the age of majority or emancipated] may escape his legal and parental obligation entirely." Green v. Green, 44 Md. App. 136, 142, 407 A.2d 1178,1182 (Ct. Spec. App. 1979). As the court noted in Green, the effect of such a outcome would cause the burden of support that belongs to the noncustodial parent to rest on the custodial parent, without affording that custodial parent an effective means of redress.
This case demonstrates just such an undesirable result. If the mother was not allowed to pursue the enforcement of the child-support judgment through the contempt powers of the courts, the father would be immune from any action attempting to enforce the judgment that accrued because of his failure to meet his duty to support his children during their minority. The assets the father presently utilizes in his day-to-day life are all maintained solely in his wife's name. The father's earnings from his employment as a consultant are paid into his wife's corporation; his wife then determines the amount of salary the father is paid through that corporation. In the past two years, the wife, through her corporation, has paid the father a gross salary that amounts to only *Page 276 
approximately one-half of the income the father generates in his consulting work.
A former custodial parent may institute a contempt action to enforce a judgment for past-due child support against a noncustodial parent even after the child has reached the age of majority or has become emancipated. Court-ordered child-support obligations arise from the noncustodial parent's duty to support his or her children and are, therefore, different in nature from ordinary judgments. Although a child-support judgment may be collected in the same manner as any other judgment, see State Dep't of Human Resources ex rel. McGhee v. McGhee,634 So.2d 573 (Ala.Civ.App. 1994), such a judgment may also be enforced through the use of a contempt proceeding. The trial court did not err in considering the mother's petition to enforce the child-support judgment through the contempt powers of the court.
The father next argues that the trial court abused its discretion in increasing the amount of the monthly payments he is ordered to pay toward the accumulated child-support arrearage. In support of this argument, the father argues that the $3,200 payment is not supported by the application of the Rule 32, Ala. R. Jud. Admin., Child Support Guidelines and that, because both children are now emancipated, the mother failed to prove that the children's needs had increased so as to justify an increase in his child-support obligation. However, those factors relate to a modification of an existing child-support obligation; they are not relevant to an action seeking to enforce an arrearage. *Page 277 
The father does not explicitly argue that he is without the ability to pay $3,200 per month toward the arrearage.[4] Out of an abundance of caution, however, we note that in its judgment, the trial court determined that the father earned in excess of $60,000 annually. The father testified that although he contributes to the household accounts, his wife pays the couple's mortgage, automobile payments, and other household bills. The father did not specify the amount he contributed for those bills.
Also, the trial court heard evidence indicating that the monthly interest on the accumulated arrearage alone is approximately $2,500 per month. The $600 monthly payments the father made pursuant to the September 1998 judgment constituted only approximately one-quarter of the monthly interest on the accumulated-arrearage judgment. The $3,200 monthly payment ordered by the trial court provides for the payment of the accruing interest and for an additional amount to be paid to reduce the principal arrearage.
The trial court's determination of a child-support arrearage and the means by which that arrearage must be repaid or reduced are within the trial court's broad discretion. Carr v. Broyles, 652 So.2d 299
(Ala.Civ.App. 1994). This court will not reverse a trial court's determination of a child-support arrearage or the manner in which it orders that arrearage to be reduced, absent a showing that the trial court plainly and palpably erred. Id. The monthly payment constitutes the majority of the father's income; however, given the facts and the presumption of correctness afforded to the trial court's judgment, we cannot say that the trial court abused its discretion in establishing the father's monthly payment toward the accumulated child-support arrearage.
The father also argues that the trial court erred in compounding the interest on the accumulated child-support arrearage since the September 1998 judgment. The father has not appealed the previous judgments establishing his accumulated arrearages. This argument relates only to the interest calculated since the September 1998 judgment.
The evidence in the record clearly indicates that the trial court didnot compound the interest. The father's $600 monthly payments were credited against the cumulative arrearage. However, the interest on that judgment continued to accumulate. Each month, a little more than $2,500 in interest accumulated on the principal arrearage. In the 20 months from August 1998[5] through March 2000, the simple interest alone on the principal arrearage totaled $50,752.37. The father's argument on this issue is without merit.
The father also argues that the trial court erred in awarding the mother a $2,000 attorney fee. The father does not dispute the amount of the fee, but argues that the mother can afford to pay her own attorney. However, the award of an attorney fee is within the trial court's broad discretion. State Dep't of Human Resources ex rel. McGhee v. McGhee, supra; Wilson v. Wilson, 537 So.2d 942 (Ala.Civ.App. 1988). We cannot say that the trial court abused its discretion in its award of an attorney fee to the mother. We affirm as to this issue.
That portion of the trial court's judgment finding the father in criminal contempt and ordering him incarcerated is reversed. All other provisions of the trial court's judgment are affirmed.
OPINION OF SEPTEMBER 15, 2000, WITHDRAWN, OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MONROE and CRAWLEY, JJ., concur.
ROBERTSON, P.J., and YATES, J., concur in the result.
[1] The main issues the father raised in his brief on application for rehearing were adequately addressed in this court's original opinion. However, the father argues in his application for rehearing that this court erred in failing to address an issue he claims to have raised in his reply brief. That "issue" was a statement contained in a footnote in the father's reply brief, a statement to the effect that his research had revealed no authority allowing for the modification of child-support arrearage payments. We cannot agree that this "issue" was properly raised. An issue that is raised for the first time in a reply brief will not be considered. C S Family Credit of Alabama, Inc. v. McNairy,613 So.2d 1232 (Ala. 1992). See also Perkins v. Dean, 570 So.2d 1217
(Ala. 1990); Kennesaw Life Accident Ins. Co. v. Old Nat'l Ins. Co.,291 Ala. 752, 287 So.2d 869 (1973); Hazelrig v. Thomas, 291 Ala. 659,286 So.2d 830 (1973). Also, this "issue" was not raised before the trial court, and it therefore cannot be considered on appeal. Andrews v.Merritt Oil Co., 612 So.2d 409 (Ala. 1992).
The father also raises a due-process argument for the first time on application for rehearing. An appellate court may not address an issue not argued on appeal. Goodyear Tire Rubber Co. v. Washington,719 So.2d 774 (Ala. 1998); Ex parte Riley, 464 So.2d 92 (Ala. 1985).
[2] The father testified that this amount also includes payment for consulting services provided to Osborn by the father's wife. He testified that his wife "occasionally" provides consulting services for Osborn.
[3] Assuming $60,000 from Osborn and $3,000 per month through the end of August 1999 from Gilchrist.
[4] The father makes this argument for the first time on application for rehearing. He points out that in one sentence contained in the "conclusion" portion of his original brief on appeal, he stated he could not afford the amount the trial court ordered him to pay toward the accumulated arrearage.
[5] The father made one $600 payment in August 1998, before the trial court entered its September 1998 judgment.