PITTMAN, Judge.
*280 TaMarkus J. King ("the father") appeals from a judgment of the Elmore Circuit Court ("the circuit court") awarding him limited visitation with C.T. ("the child"), a boy to whom Kimberly Tillman-Gilbert ("the mother") gave birth in 2007. We reverse and remand.
In late 2006, the mother and the father had a three-month sexual relationship during which the child was conceived. The mother and the father never married. The father subsequently married another woman and had two daughters by her, and the mother subsequently married another man and had three children by him. In 2008, the mother brought a child-support action against the father in the Perry Juvenile Court ("the juvenile court"); however, the juvenile court dismissed that action in March 2010 "due to [the mother's] refusal to abide by any orders of [the juvenile court]."
In January 2015, when the child was seven years old, the father brought the present action against the mother in the circuit court, seeking visitation with the child. In April 2016, the circuit court entered a pendente lite order determining that the father was the biological father of the child; awarding custody of the child to the mother; ordering the father to pay child support in the amount of $451 per month commencing May 1, 2016; ordering the father not to "directly or indirectly state to [the child] that [the father] is [the child's] father; and ordering the mother and the father "to establish a meeting (play date) for the children to all get together, and know one another," with "no restrictions as to who may come."
In May 2016, the father sent the circuit court a letter reporting that he could communicate with the mother only through Facebook, a social-media Web site; that he had attempted to contact the mother through Facebook twice in April and once in May about scheduling a play date; and that the mother had failed to respond. The circuit court treated the father's letter as a motion to find the mother in contempt and ordered the mother to appear and show cause why she should not be held in contempt for violating the circuit court's pendente lite order. After several continuances, the circuit court held the show-cause hearing. Thereafter, in September 2016, the circuit court entered an order finding that the play dates required by the pendente lite order had not occurred, ordering "the parties ... to meet for 3 hours beginning at 12:00 noon on 9-10-16 and 10-1-16 at [a designated restaurant] for the parties' child to be with and communicate with his father," and setting a hearing in October 2016 to review the parties' compliance with that order. Following that compliance hearing, the circuit court entered an order finding that the parties were in compliance.
In December 2016, the father filed a motion asking the circuit court to set a final hearing in the action. In response, the circuit court scheduled a final hearing in February 2017; however, that hearing was subsequently continued. In March 2017, the circuit court held another compliance hearing. Thereafter, the circuit court entered an order finding that the parties were in compliance and noting that the child still did not know that the father was his biological father and thought that the mother's husband was his father.
The circuit court commenced a final hearing in May 2017 and concluded it in *281 August 2017. After the final hearing was concluded, the circuit court, in August 2017, entered a final judgment providing "that the parties have been exercising a play-date visitation schedule, whereby the parties and their children appear at a previously [designated] restaurant for the children and parents to see and visit with one another"; ordering that the parties were to continue to adhere to that play-date visitation schedule; ordering that the father was to continue to adhere to the provision in the pendente lite order prohibiting him from informing the child of the father's paternity; and ordering that the father was to continue paying child support in the amount of $451 per month.
The father timely filed a postjudgment motion challenging the circuit court's judgment insofar as it limited his visitation and prohibited him from informing the child of the father's paternity. Following a hearing on the father's postjudgment motion, the circuit court entered an order amending the judgment to specify that the monthly play dates were to occur on the last Saturday of each month but otherwise denying the relief sought by the father. The father then timely appealed to this court.
On appeal, the father argues that the circuit court erred in limiting his visitation because, he says, one three-hour play date per month does not afford him sufficient time with the child and because, he says, allowing the mother and her husband to attend his visits with the child has resulted in de facto supervised visitation because the mother and her husband have attended every play date. He also argues that the circuit court exceeded its discretion in prohibiting him from informing the child of the father's paternity.
The father acknowledges that "[a] trial court has broad discretion in determining the visitation rights of a noncustodial parent" and that "its decision in this regard will not be reversed absent an abuse of discretion," Carr v. Broyles, 652 So.2d 299, 303 (Ala. Civ. App. 1994) ; however, he asserts that, under Alabama law, "[a] noncustodial parent generally enjoys 'reasonable rights of visitation' with his or her child[ ]," Pratt v. Pratt, 56 So.3d 638, 641 (Ala. Civ. App. 2010) (quoting Naylor v. Oden, 415 So.2d 1118, 1120 (Ala. Civ. App. 1982) ). He acknowledges that a trial court may restrict a noncustodial parent's visitation to protect a child from conduct, conditions, or circumstances surrounding the noncustodial parent that endanger the child's health, safety, or well-being; however, he asserts that the circuit court had no evidence before it indicating that the father's conduct, conditions, or circumstances posed a danger to the child's health, safety, or well-being. To the contrary, the father argues that the undisputed evidence indicated that he is willing and able to care for the child; that he has a job; that he has been married for seven years; that he has two daughters, who are the child's half sisters; and that he is eager to form and maintain a meaningful parent-child relationship with the child. The mother's opposition to the father's being awarded "standard" visitation was based solely on her contention that the father had not come forward to assume the responsibilities of a parent earlier in the child's life. However, she admitted that the father had sought visitation in the child-support action she had brought in 2008; that, in that child-support action, she would agree only to the father's being awarded the limited, de facto supervised visitation that was later awarded the father by the circuit court in the pendente lite order entered in the present action; that the father had been unwilling to settle for such limited visitation; and that the juvenile court had dismissed the child-support action before ruling on the father's visitation. The record is clear that the mother has never been willing *282 to facilitate or encourage a relationship between the father and the child. For example, she testified:
"Q. [By the father's counsel:] Let me ask you since these visits have been established, what have you done to make sure that [the child] feels comfortable around [the father]?
"A. I have brought him to the visitations.
"Q. Did you explain to him that he was there to see [the father]?
"A. The Court documentation does not say that he is there to come see [the father]. The Court documentation says play dates.
"Q. So as far as you're concerned, you just took [the child] there to just eat and play at Burger King?
"A. That's correct, according to what it says.
"Q. Do you understand that the reason for the visits were so that [the child] could establish a relationship with [the father]? Do you understand that?
"A. I understand that I'm to bring my child to the place that is designated and that's what we have done.
"Q. But you made no attempt to make sure that a relationship was established between [the child] and [the father]?
"A. It wasn't in the court -- I was not told that I had to do anything other than bring my child to the play dates.
"Q. So regarding [the child's] relationship with [the father], you are not going to do anything unless it is Court ordered; is that true?
"A. At this time, that's what I'm supposed to do, abide by the Court order because he brought it to court. That's what we're doing."
The United States Supreme Court has held that the parental rights of an unwed father who does not come forward to accept his responsibilities as a parent when his child is born is not entitled to the full protection of the United States Constitution. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). However, the United States Supreme Court's decisions are not controlling in determining whether Alabama law affords an unwed father's parental rights protection. See Ex parte D.J., 645 So.2d 303 (Ala. 1994). As the father states in his brief, "[t]he State of Alabama has a public policy encouraging interaction between noncustodial parents and their children." See, e.g., Pratt, 56 So.3d at 641.
"In fashioning the appropriate restrictions [on the visitation awarded a noncustodial parent], out of respect for the public policy encouraging interaction between noncustodial parents and their children, see Ala. Code 1975, § 30-3-150 (addressing joint custody), and § 30-3-160 (addressing Alabama Parent-Child Relationship Protection Act), the trial court may not use an overbroad restriction that does more than necessary to protect the child[ ]. See Smith v. Smith, 887 So.2d 257 (Ala. Civ. App. 2003), and Smith v. Smith, 599 So.2d 1182, 1187 (Ala. Civ. App. 1991)."
Pratt, 56 So.3d at 641.
This court's decision in Carr v. Broyles, supra, is instructive. In Carr,
"Sandra Gail Broyles Carr [ ('Sandra') ] and Mike Lane Broyles [ ('Mike') ] were divorced in 1990. [Mike] was awarded custody of the parties' minor child [ ('the daughter'], a daughter who [was] five years old. [Sandra] was ordered to pay child support in the amount of $192.42 per month and was awarded visitation every other weekend, plus time in the summer and on holidays. [Sandra] made no child support payments to [Mike]. Her exercise of her *283 visitation rights was sporadic, but she contended that [Mike] refused to let her see the daughter because she had not paid child support. [Mike] did let the daughter visit her maternal grandparents, but he informed them that he did not want the [daughter] around [Sandra].
"In February 1994 [Sandra] petitioned the trial court for a reduction in child support and for enforcement of her visitation rights. [Mike] counterpetitioned, asking the court to terminate [Sandra's] parental rights and to hold her in contempt for nonpayment of child support. After a hearing, the trial court refused to terminate [Sandra's] parental rights, found her to be in contempt of its prior order because of her failure to pay child support, ordered her incarcerated unless she paid $3,000 toward her arrearage within 60 days, modified her current child support obligation to $156.32 per month, ordered her to pay an additional $150 per month toward an arrearage of $9,012, and modified her visitation to one weekend each month and 48 hours at Christmas, with all visitation to be supervised by her parents."
652 So.2d at 300-01. Sandra then appealed to this court and asserted, among other things, that the trial court had exceeded its discretion in modifying her visitation privileges with the daughter. Reversing the trial court's judgment insofar as it had modified Sandra's visitation privileges, this court stated:
"Finally, we review the trial court's modification of [Sandra's] visitation privileges with the daughter. The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision in this regard will not be reversed absent an abuse of discretion. Alexander v. Alexander, 625 So.2d 433, 435 (Ala. Civ. App. 1993). Every case involving a visitation issue must be decided on its own facts and circumstances, but the primary consideration in establishing the visitation rights accorded a noncustodial parent is always the best interests and welfare of the child. Fanning v. Fanning, 504 So.2d 737, 739 (Ala. Civ. App. 1987).
"The record in this case reflects the following: [Sandra's] last regular visitation with the daughter occurred in February 1993, and she last saw the child in November 1993. The daughter has visited more recently with her maternal grandparents. [Mike] is in part responsible for this situation, because of his refusing to allow the daughter to visit with [Sandra] and his discouraging the grandparents from allowing the daughter to see [Sandra]. [Sandra's] financial situation has hampered her ability to obtain legal assistance in enforcing the visitation afforded her in the divorce judgment. She does not seek an increase in that visitation, but only to exercise the visitation privileges she was granted previously.
"Aside from [Sandra's] failure to pay child support, [Mike] stated that he denied visitation because of [Sandra's] lifestyle, especially the men whom she dates and with whom she has occasionally lived. The record reflects, however, that [Sandra] says she has never allowed a man to stay overnight if the daughter was staying with her and that the daughter has spent very little time around any of the men whom the mother has dated. [Mike] and his present wife, Christine, testified that in their opinions, the daughter's best interests would be best served if [Sandra's] parental rights are terminated and if Christine Broyles is allowed to adopt the daughter. Testimony reflected, however, that the daughter asks about [Sandra] and wants to see [Sandra] and her stepbrother.
*284 "Our examination of the record reveals no evidence to indicate that [Sandra] is in any way incapable of caring for the daughter when the child is visiting with her. [Sandra's] 16-month-old son from her second marriage lives with her, and nothing in the record demonstrates any concern about the welfare of this child in her care. Of equal importance, no evidence in the record suggests that visiting with [Sandra] is in any way detrimental to the daughter. This court has previously held that if a divorce judgment is modified to limit a parent's visitation based on misconduct, the limitation ordered must be supported by evidence that the misconduct of the parent is detrimental to the child. Jones v. Haraway, 537 So.2d 946, 947 (Ala. Civ. App. 1988).
"Based on the record before us, we conclude that the trial court abused its discretion in reducing [Sandra's] visitation with the daughter. The trial court appears to have reduced [Sandra's] visitation privileges primarily because of her failure to meet her financial obligations toward her daughter. Reduced visitation on that basis is not in the best interests of this child. A noncustodial parent should be given the opportunity to maintain a meaningful relationship with her child. Speakman v. Speakman, 627 So.2d 963, 965 (Ala. Civ. App. 1993). The trial court's reduction of [Sandra's] visitation rights is not reasonable, given the evidence that the daughter wants to visit with [Sandra] and [her] sibling and that [Sandra] seeks the opportunity to re-establish her relationship with her daughter. We have previously approved limited visitation structured by a trial court to allow for a gradual reacquaintance between a [noncustodial parent] and his children who had not seen each other for some time. Fanning, 504 So.2d at 738-39. In Fanning, however, the trial court set time limits on the limited visitation and expanded the [noncustodial parent's] visitation schedule after allowing for time in which the [noncustodial parent] could re-establish his relationship with his children. The trial court in this case has allowed [Sandra] to become reacquainted with her daughter, but has made no provisions to allow her a reasonable opportunity to develop their relationship.
"Likewise, we conclude that the trial court abused its discretion in ordering that all visitation be supervised by the maternal grandparents. The testimony that [Sandra] is capable of caring for her daughter during visitation was undisputed. There is no evidence that visiting in [Sandra's] home has ever been, or will be, harmful to the daughter. This court has upheld supervised visitation in cases in which there were allegations of abuse on the part of the noncustodial parent or in instances in which the noncustodial parent experienced severe psychological problems. See, e.g., I.L. v. L.D.L., Jr., 604 So.2d 425 (Ala. Civ. App. 1992) ; Y.A.M. v. M.R.M., 600 So.2d 1035 (Ala. Civ. App. 1992) ; Watson v. Watson, 555 So.2d 1115 (Ala. Civ. App. 1989) ; Caldwell v. Fisk, 523 So.2d 464 (Ala. Civ. App. 1988). Those concerns are not present in this case. We reverse that portion of the trial court's judgment reducing and restricting [Sandra's] visitation with her daughter and remand this case to the trial court with instructions to set a more reasonable, expanded schedule of unsupervised visitation between [Sandra] and the daughter."
652 So.2d at 303-04.
In Carr, Sandra had not paid some of the child support she had been ordered to pay and had visited the daughter only sporadically. The record indicated that Sandra was solely responsible for her failure *285 to pay child support and that both Sandra and Mike were responsible to some extent for Sandra's sporadic visitation with the daughter. This court held that Sandra's failure to pay child support and her failure to visit the child regularly, even to the extent that she was responsible for that failure, were not valid bases for limiting her visitation to 1 weekend each month and 48 hours at Christmas. In the present case, the record indicates that the father failed to pay child support at some unspecified times in the past and failed to visit the child regularly. The father testified that his failure to pay child support had resulted from his inability to locate the mother to pay her; the mother testified that he knew where she was located at all times. Even if we assume that the father was solely responsible for his failure to pay child support in the past, the mother's own testimony indicates that she shares some of the responsibility for the father's failure to visit the child regularly. Consequently, based on the authority of Carr, we conclude that the father's failure to pay child support in the past and his failure to visit the child regularly were not valid bases for limiting his visitation to one three-hour play date per month. As we noted in Carr, this court has "approved limited visitation structured by a trial court to allow for a gradual reacquaintance between a [noncustodial parent] and his child[ ] who have not seen each other for some time," 652 So.2d at 304. Thus, the limited play-date visitation the father was awarded pendente lite in the present case was appropriate; however, the record does not support the circuit court's maintaining such limited visitation in the final judgment.
In Carr, this court held that the trial court had exceeded its discretion in restricting Sandra's visitation to supervised visitation in the absence of any evidence indicating that her conduct, conditions, or circumstances posed a danger to the daughter's health, safety, or well-being. In the present case, the record contains no evidence indicating that the father's conduct, conditions, or circumstances pose a danger to the child's health, safety, or well-being. Therefore, we conclude that the circuit court exceeded its discretion in imposing de facto supervision on the father's visitation by allowing the mother and her husband to attend the father's visits.
"A noncustodial parent should be given the opportunity to maintain a meaningful relationship with [his] child." Carr, 652 So.2d at 304. The father and the child cannot form and maintain a meaningful parent-child relationship if the child does not even know that the father is one of his parents. Therefore, we conclude that the circuit court exceeded its discretion by prohibiting the father from telling the child about his paternity. Accordingly, we reverse the judgment of the circuit court and remand the cause for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
Thomas and Donaldson, JJ., concur in the result, without writings.
Moore, J., dissents, with writing, which Thompson, P.J., joins.